## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMERANTH, INC.
5820 Oberlin Drive
Suite 202
San Diego, CA 92121,

      Plaintiff,

v.

MARC D. KESSMAN
70 Athena Ct.
Mahopac, NY 12533,

TEKNOWIDGETS, LLC,
70 Athena Ct.
Mahopac, NY 12533,

      Defendants.

Civil Action No.　　　0 8 - 8 5 1 .

Judge

Filed on November 17, 2008

## VERIFIED COMPLAINT

1.　　Plaintiff Ameranth, Inc. ("Ameranth"), a market leader in technology used to manage poker rooms, files this Verified Complaint against Defendants Marc D. Kessman ("Mr. Kessman"), Ameranth's former Gaming Chief Technology Officer, and TeknoWidgets, LLC ("TeknoWidgets"), an entity Mr. Kessman created without Ameranth's knowledge and used to compete against his employer. Ameranth seeks temporary, preliminary, and permanent injunctive relief to remedy Mr. Kessman's breach of his contractual and fiduciary duties to Ameranth and his misappropriation of Ameranth's trade secrets and confidential information. Mr. Kessman sabotaged Ameranth's operations and betrayed his position of trust with the Company by simultaneously (1) undermining Ameranth's relations with its customers, and (2) converting Ameranth's critical technology and information to his own use, and then using Ameranth's property to compete with Ameranth. Mr. Kessman thus cost Ameranth one of its most lucrative gaming customers and poses a continuing menace to Ameranth's business.

## PARTIES

2. Ameranth is a citizen of both Delaware and California: it is incorporated under the laws of Delaware, and has its principal place of business in San Diego, California.

3. Mr. Kessman is a citizen of New York: he resides at 70 Athena Ct., Mahopac, New York, his permanent home and principal establishment, to which he has the intention of returning when he is absent therefrom.

4. TeknoWidgets is a limited liability company whose sole member is Mr. Kessman. TeknoWidgets operates out of Mr. Kessman's home at 70 Athena Ct., Mahopac, New York. Mr. Kessman is a citizen of New York. Thus, TeknoWidgets is also a citizen of New York.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over Ameranth's claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, pursuant to 28 U.S.C. § 1331.

6. The Court has supplemental jurisdiction over Ameranth's state-law claims, pursuant to 28 U.S.C. § 1367(a), because those claims and the claim under the Computer Fraud and Abuse Act form part of the same case or controversy.

7. The Court also has jurisdiction over all claims asserted here pursuant to 28 U.S.C. § 1332. There exists diversity of citizenship among the parties, and the extent of Ameranth's injury is greater than $75,000, exclusive of interest and costs.

8. As to Mr. Kessman, venue is proper in this Court under 28 U.S.C. § 1391 because the contract that Mr. Kessman breached has a forum-selection clause providing that any suit arising out of or relating to the contract or its breach shall be brought exclusively in any state or federal court in Delaware. All of the claims asserted against Mr. Kessman arise from the contractual relationship and implicate the contract's terms.

9.     Venue is proper as to TeknoWidgets because, although it is a non-signatory to the forum-selection clause, it is very closely related to the contractual relationship between Ameranth and Mr. Kessman, and should have clearly foreseen governance by the clause. Moreover, TeknoWidgets is an alter ego of Mr. Kessman, who is its sole member.

10.     Additionally, venue is proper as to TeknoWidgets because it has conducted business in Delaware, and with Delaware citizens, such that it has continuous and systematic contacts with Delaware, and because, on information and belief, it has engaged in conduct in Delaware that is directly related to the controversy.

## BACKGROUND

11.     In 2004, Ameranth began development of its Poker Room Management ("PRM") product, a derivation of similar products Ameranth had developed in the restaurant market segment. Ameranth's PRM product replaces the tedious manual processes associated with the management of poker rooms with effortless, automated methods, resulting in expedited seating and table management, alleviated board management difficulties, and a more impressive facade for incoming players. Ameranth's PRM product also reduces staffing needs, dropping overhead costs significantly. By the summer of 2006, Ameranth had established itself as one of the market leaders for installed poker tables in North America.

12.     Mr. Kessman is the founder, and former president and CEO, of the now-defunct QueueOS, LLC ("QueueOS"). QueueOS also sold technology used to manage poker rooms. By 2006, QueueOS also had captured a significant market share of the installed poker tables with its QueueOS Suite of Casino Products, including the "QueueOS" name. QueueOS had secured contracts with Harrah's Casinos, the World Series of Poker, and other casinos.

13.     In 2006, Ameranth and Mr. Kessman began negotiating for Ameranth to purchase

the assets of QueueOS. Ameranth was attracted to a potential asset purchase agreement in large part because it wanted to purchase the full suite of QueueOS products that Mr. Kessman, on behalf of QueueOS, had represented was available, and because Ameranth wanted to acquire the key customers of QueueOS. Those customers included Commerce Casino, the world's largest poker room.

14.     Although Ameranth's PRM products were comparable to QueueOS's products in base product functionality, Ameranth did not have the full suite of products that Mr. Kessman represented that he could provide. Ameranth wanted to sell the full suite of QueueOS products to the acquired QueueOS customers, and to Ameranth's existing customers.

15.     On July 22, 2006, Ameranth, as the buyer, QueueOS, as the seller, and Mr. Kessman, as QueueOS's owner, entered into an Asset Purchase Agreement ("APA"), whereby Ameranth agreed to acquire substantially all of the assets, properties, and rights used by QueueOS in the poker-room management business. Under the APA, Ameranth assumed certain liabilities of QueueOS, and agreed to compensate Mr. Kessman with $1,200,000 and 1,000,000 shares of Ameranth common stock. Ameranth was to pay Mr. Kessman a $1,200,000 purchase price in three installments, $300,000 initially, and $450,000 on both the second and third anniversaries of the signing of the APA provided certain earn-out conditions were met.

16.     Along with its acquisition of QueueOS's assets, Ameranth also decided to employ Mr. Kessman. On July 22, 2006, Ameranth and Mr. Kessman entered into an Employment Agreement, under which Mr. Kessman became Chief Technology Officer of Ameranth's newly created QueueOS Gaming Division, earning a base salary of $200,000 during the first year and more thereafter. Mr. Kessman continued to work full-time as Ameranth's Chief Technology Officer for the QueueOS Gaming Division until November 14, 2008.

17.     As Ameranth's Gaming Chief Technology Officer, Mr. Kessman became privy to Ameranth's confidential, proprietary information, and he was required to exercise a high standard of care in managing Ameranth's property. For example, Mr. Kessman was aware of, and obligated to protect, the source code and product specifications that Ameranth acquired through the APA, Ameranth's proprietary customer lists, pricing, account statuses, and other valuable information. Because Ameranth and QueueOS products were to interface with one another, Mr. Kessman also became privy, through his new role at Ameranth, to the proprietary technical information of Ameranth's own PRM product and technology.

18.     Source code is a collection of statements or declarations written in a human-readable computer programming language. Source code allows the programmer to communicate with the computer using a reserved number of instructions.

19.     Shortly after entering into the APA and Employment Agreement, Ameranth concluded that Mr. Kessman had, *inter alia* breached the APA and committed fraud in the inducement, because Mr. Kessman had, *inter alia*, falsely represented that many QueueOS products were functional when, in reality, many of those products did not work, and some did not even exist. Additionally, Ameranth had concluded that Mr. Kessman concealed from Ameranth approximately $1,000,000 in undisclosed liabilities, and failed to deliver all of the source code that Ameranth had purchased under the APA.

20.     Accordingly, on July 23, 2007, Ameranth filed suit against Mr. Kessman in the Superior Court of California.

21.     Mr. Kessman likewise brought suit against Ameranth, seeking the remaining payments due under the APA.

22.     The parties settled both lawsuits by entering into a Settlement Agreement and

5

Mutual Release, dated November 14, 2007 ("the Settlement Agreement"). The Settlement Agreement incorporated the parties' obligations under both the APA and the Employment Agreement, as amended by the Settlement Agreement.

23.     That agreement contains a confidentiality provision providing that it may be introduced in any proceeding to enforce the agreement. Ameranth is contemporaneously filing a motion to file the Settlement Agreement under seal.

24.     Among its other provisions, the Settlement Agreement incorporated Section IV of Attachment A to the Employment Agreement, titled Inventions and Intellectual Property. Under Section IV, Mr. Kessman assigned to Ameranth all inventions and intellectual property that he created or conceived while he was Ameranth's Gaming Chief Technology Officer, provided that such inventions or intellectual property related to Ameranth's actual or anticipated business, or related to any work Mr. Kessman did while employed by Ameranth. Thus, Ameranth owns any poker room management technology, or any inventions or intellectual property relating the management of poker rooms, that Mr. Kessman created between July 22, 2006 and November 14, 2008.

25.     After signing the Settlement Agreement, Mr. Kessman made no attempt to discharge effectively and loyally his duties as Gaming Chief Technology Officer. Instead, he used his position as Gaming Chief Technology Officer to secretly sabotage Ameranth's business. From November 14, 2007 through early November 2008, Ameranth depended on Mr. Kessman to service and support many of the Company's key customers and accounts, and to complete vital software engineering tasks. Mr. Kessman failed to complete these critical gaming tasks for Ameranth's customers, and intentionally delayed projects. Mr. Kessman thus cost Ameranth hundreds of thousands of dollars.

26.     Not only did Mr. Kessman fail to comply with his affirmative duties under the

Settlement Agreement, he disregarded the Settlement Agreement's negative restrictions.  Under

the Settlement Agreement, Mr. Kessman is, or was, obliged not to

        (a)     compete with Ameranth while he was a full-time employee of the

Company;

        (b)     misappropriate Ameranth's confidential information or property;

        (c)     use the QueueOS name or any of its variations without authorization; and

        (d)     retain Ameranth's property upon the cessation of his employment,

including all copies of the source code Ameranth purchased through the APA.

27.     Mr. Kessman has violated each of these obligations.

### MR. KESSMAN'S UNFAIR COMPETITION AGAINST AMERANTH

28.     On November 8, 2007, five days before he signed the Settlement Agreement, Mr.

Kessman incorporated TeknoWidgets.

29.     Mr. Kessman incorporated TeknoWidgets secretly: he did not inform Ameranth

of the incorporation of TeknoWidgets.

30.     TeknoWidgets is Mr. Kessman's alter ego.

31.     Mr. Kessman formed TeknoWidgets for the purpose of competing with

Ameranth.

32.     With full access to Ameranth's proprietary QueueOS source code, and all of its

product specifications, including the specifications for the PRM system, Mr. Kessman was able

to create rapidly the TeknoWidgets system and unfairly compete against Ameranth.

33.     TeknoWidgets is, in essence, QueueOS LLC by a different name.

34.     On its website, TeknoWidgets states that it offers "software development and

custom software development services specializing in e-commerce and embedded gaming management systems." The website further states that TeknoWidgets' "cornerstone product, Next Generation Casino Management (NGCM), is a powerful set of employee and administration tools that enhance casino operations by providing seamlessly [sic] interaction into today's work flow process."

35.     On or about April 15, 2008, Mr. Kessman re-directed Ameranth's proprietary QueueOS email traffic from Ameranth's proprietary datacenter located in California to a server under his personal control and located near his home in New York.

36.     Mr Kessman re-directed the emails without Ameranth's authorization or knowledge.

37.     Mr. Kessman re-directed the emails for the purpose of diverting Ameranth's customers and potential customers to himself and/or to TeknoWidgets and to hide his activities from Ameranth.

38.     Mr. Kessman deleted customer emails sent to Ameranth's email web site located at www.queueos.com that were received between December 6, 2007 and April 15, 2008.

39.     Additionally, using the QueueOS name, Mr. Kessman diverts web traffic to the TeknoWidgets website.

40.     While employed by Ameranth, Mr. Kessman copied Ameranth's source code.

41.     Mr. Kessman used that source code to develop a product or products for TeknoWidgets.

42.     While employed by Ameranth, Mr. Kessman copied Ameranth's customer lists.

43.     While employed by Ameranth, Mr. Kessman copied Ameranth's technical manuals.

8

44. Mr. Kessman copied Ameranth's source code, customer lists, and technical manuals with the intention of competing with Ameranth.

45. From a location in New York, Mr. Kessman copied Ameranth's source code, customer lists, and technical manuals from Ameranth's proprietary datacenter, which is located in California. Mr. Kessman did this by using the internet.

46. Both Defendants have since used Ameranth's source code, technical manuals, emails, customer lists, the QueueOS name, and other properties belonging to Ameranth (hereinafter, "Ameranth's property") to develop and market TeknoWidgets' poker room management products.

47. Additionally, Mr. Kessman has been conspiring with Thomas Calvin, Ameranth's former Director of Gaming Technology/Sales, to utilize Ameranth's property against it. Mr. Calvin left Ameranth's employment in May 2008.

48. Mr. Kessman became associated with Mr. Calvin by violating Article VII of the Employment Agreement, as incorporated in the Settlement Agreement: while Mr. Kessman and Mr. Calvin were both employed by Ameranth, Mr. Kessman solicited Mr. Calvin to form a new enterprise and collaborate with Mr. Kessman to compete with Ameranth.

49. Shortly after leaving Ameranth's employment in May 2008, Mr. Calvin formed an entity, Patron Loyalty Systems, LLC ("Patron"). According to its website, Patron "is a Hospitality and Gaming Consulting Company." Patron's website goes on to state, in an announcement dated September 1, 2008, as follows: "Patron Loyalty Systems, LLC of Florida announces an agreement with TeknoWidgets, headquartered in Nevis, to be the worldwide reseller of their Next Generation Casino Management System. Under the agreement, PLS will sell, install, service and provide training for the TeknoWidgets product line."

50.     In September 2008, Mr. Calvin sent an e-mail blast to Ameranth's customers. In that email blast, Mr. Calvin disparaged Ameranth's products, promoted the NGCM software offered by TeknoWidgets and Patron, and falsely implied that he was authorized to provide maintenance and support for Ameranth's proprietary products. When Ameranth later questioned Mr. Calvin about this email blast, Mr. Calvin admitted that he had used at least some of Ameranth's customer list to send the e-mail.

51.     In the summer of 2008, while employed by Ameranth, Mr. Kessman conspired with Mr. Calvin and with Patron to provide poker room management services to an Ameranth client, Commerce Casino. Ameranth had acquired Commerce Casino's business from Mr. Kessman under the APA executed in July 2006.

52.     As part of the conspiracy to usurp Commerce Casino's business, Mr. Kessman used the email address marc@queueos.com, and traveled to Commerce Casino's poker room in Los Angeles, California. As a result of this conspiracy, *and while he was still employed as Ameranth's Gaming Chief Technology Officer*, Mr. Kessman caused TeknoWidgets to displace Ameranth from the world's largest poker room: Commerce Casino now uses a TeknoWidgets product to manage its poker room, and has ceased to use Ameranth's product. The loss of Commerce Casino, by itself, has cost Ameranth more than $75,000.

53.     The TeknoWidgets product that Mr. Kessman sold to Commerce Casino was developed from source code and technical manuals that belong to Ameranth pursuant to the APA, and that Mr. Kessman has misappropriated from Ameranth. In luring away Commerce Casino's business, Mr. Kessman also used Ameranth's proprietary customer lists. Mr. Kessman stole the source code, technical manuals, and customer lists from Ameranth even while Ameranth employed him as its Gaming Chief Technology Officer.

10

54.     Additionally, while he was charged with working to develop a proprietary

tracking capability for Ameranth, Mr. Kessman instead disclosed that project to non-employees

of Ameranth, including Mr. Calvin. Mr. Kessman used Ameranth's contacts with a

subcontractor to develop the project and then, while still employed by Ameranth, Mr. Kessman

offered that project as his own, or TeknoWidgets' own, to Ameranth's customers.

55.     On November 14, 2008, Mr. Kessman's employment with Ameranth ceased.

Notwithstanding the cessation of that employment, Mr. Kessman has wrongfully retained

Ameranth's property. Mr. Kessman intends to continue to use, and has used, Ameranth's

property to compete with Ameranth and interfere with Ameranth's business relations.

56.     Both Defendants, with the assistance of Mr. Calvin and Patron, have used, and are

in the process of using, Ameranth's property to market TeknoWidgets' poker-room management

products to Ameranth's existing and potential customers.

## COUNT I: VIOLATION OF COMPUTER FRAUD AND ABUSE ACT
## (Against Mr. Kessman)

57.     Ameranth incorporates by reference paragraphs 1 through 56.

58.     Mr. Kessman intentionally accessed Ameranth's computer or computers without

authorization or exceeded his authorized access, and, *inter alia*, redirected emails from

Ameranth's datacenter located in California at www.queueos.com to a web server under his

control and located near his home in New York.

59.     Mr. Kessman misappropriated Ameranth's property from Ameranth's computer

or computers.

60.     Ameranth protected those computers by using passwords and other protective

measures.

61.     Mr. Kessman used interstate communications as part of this scheme: he was

11

physically located in New York when he misappropriated Ameranth's property from Ameranth's California-based datacenter server, and caused Ameranth's emails to be re-directed.

62.    By knowingly copying, diverting, deleting, or misappropriating Ameranth's proprietary information and emails, Mr. Kessman has caused Ameranth damages in excess of $5,000.

63.    Mr. Kessman's continuing violation of the Computer Fraud and Abuse Act is damaging Ameranth's customer relations, and thereby inflicting irreparable harm.

## COUNT II: BREACH OF SETTLEMENT AGREEMENT
### (Against Mr. Kessman)

64.    Ameranth incorporates by reference paragraphs 1 through 63.

65.    Under the Settlement Agreement, Mr. Kessman (a) while he was a full-time employee of Ameranth, was prohibited from competing with Ameranth; (b) was not to misappropriate Ameranth's property; (c) was to cease using the QueueOS name or any of its variations without authorization; and (d) upon cessation of employment with Ameranth, was to return all of Ameranth's property.

66.    Mr. Kessman has breached all of those aspects of the contract, and simply failed to perform his role as Gaming Chief Technology Officer.

67.    Mr. Kessman also violated Article VII of the Employment Agreement, as incorporated in the Settlement Agreement: while Mr. Kessman and Mr. Calvin were both employed by Ameranth, Mr. Kessman solicited Mr. Calvin to leave Ameranth, form a new, competitive enterprise, and collaborate with Mr. Kessman to compete with Ameranth.

68.    Ameranth performed its obligations under the Settlement Agreement.

69.    Mr. Kessman has caused monetary harm to Ameranth, including but not limited to the monetary harms flowing from the loss of Commerce Casino's business.

12

70.     Mr. Kessman is in the process of causing Ameranth irreparable harm, because he

is using Ameranth's property to lure away existing customers of Ameranth, to prevent

relationships with future customers, and to interfere with Ameranth's business relations. He is

also diverting email traffic sent to the www.queueOS.com email web site.

## COUNT III: INTENTIONAL INTERFERENCE WITH BUSINESS AND CONTRACTUAL RELATIONS
### (Against TeknoWidgets)

71.     Ameranth incorporates by reference paragraphs 1 through 70.

72.     Since its execution, the Settlement Agreement has been a valid contract between

Ameranth and Mr. Kessman.

73.     Ameranth had and has valid business relationships with its customers and

prospective customers.

74.     TeknoWidgets is imputed with the knowledge of its principal, Mr. Kessman.

75.     TeknoWidgets has known since the inception of the Settlement Agreement that

the Settlement Agreement existed.

76.     TeknoWidgets has known since its inception that Ameranth had and has valid

business relationships with its customers and prospective customers.

77.     TeknoWidgets intentionally acted to induce a breach or disruption of the

Settlement Agreement and Ameranth's business relationships.

78.     TeknoWidgets willfully used Ameranth's property to develop and market a poker-

room management product that would compete with Ameranth's PRM and QueueOS products.

79.     TeknoWidgets succeeded in disrupting the Settlement Agreement and Ameranth's

business relationships: without TeknoWidgets' cooperation, Mr. Kessman would have lacked the

motive or opportunity to commit his aforementioned breaches of contract.

80.     These breaches of the Settlement Agreement and interference with Ameranth's

business relationships have caused monetary harm to Ameranth, including but not limited to the monetary harms flowing from the loss of Commerce Casino's business.

81.     TeknoWidgets continues to cause Ameranth irreparable harm, because it is helping Mr. Kessman to use Ameranth's property to lure away existing customers of Ameranth, to prevent relationships with future customers, and to interfere with Ameranth's business relations.

## COUNT IV: BREACH OF FIDUCIARY DUTY OF LOYALTY (Against Mr. Kessman)

82.     Ameranth incorporates by reference paragraphs 1 through 81.

83.     From July 22, 2006 through November 14, 2008, Mr. Kessman was Ameranth's fiduciary: as Ameranth's Gaming Chief Technology Officer, Mr. Kessman became privy to Ameranth's confidential, proprietary information, and he was required to exercise a high standard of care in managing Ameranth's property. For example, Mr. Kessman was aware of, and responsible for protecting, the source code and technical manuals that Ameranth acquired in the APA, and Ameranth's customer lists.

84.     Mr. Kessman breached his fiduciary duty to Ameranth by failing to perform his role as Gaming Chief Technology Officer, by misappropriating Ameranth's property, and by competing directly with Ameranth through TeknoWidgets, and competing indirectly with Ameranth through Mr. Calvin and Patron.

85.     Mr. Kessman breached his fiduciary duty to Ameranth because, while Mr. Kessman and Mr. Calvin were both employed by Ameranth, Mr. Kessman solicited Mr. Calvin to leave Ameranth, form a new, competitive enterprise, and collaborate with Mr. Kessman to compete with Ameranth.

86.     On November 14, 2007, Mr. Kessman breached his fiduciary duty to Ameranth

14

by misrepresenting to Ameranth that he would not compete with Ameranth in the poker room management business while he remained Ameranth's Gaming Chief Technology Officer. In fact, approximately one week before he made that misrepresentation, Mr. Kessman had secretly formed TeknoWidgets for the purpose of competing with Ameranth.

87.     Ameranth was damaged by Mr. Kessman's breaches of fiduciary duty. Had Ameranth known that Mr. Kessman intended to compete with Ameranth, Ameranth would have discharged him for cause in November 2007, and Ameranth would not have dismissed its initial lawsuit against Mr. Kessman. Mr. Kessman's deceit also cost Ameranth one of its largest customers, Commerce Casino, and caused Ameranth to pay Mr. Kessman a salary to which he was not entitled.

## COUNT V: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against TeknoWidgets)

88.     Ameranth incorporates by reference paragraphs 1 through 87.

89.     TeknoWidgets knew that Mr. Kessman's conduct constituted a breach of the duty of loyalty.

90.     TeknoWidgets gave Mr. Kessman substantial assistance or encouragement to breach that duty.

91.     TeknoWidgets willfully used Ameranth's property to develop and market a poker-room management product that competes with Ameranth's PRM products.

92.     Ameranth was damaged by Mr. Kessman's breaches of fiduciary duty, which TeknoWidgets aided and abetted. Had Ameranth known that Mr. Kessman intended to compete with Ameranth, Ameranth would have discharged him for cause in November 2007, and Ameranth would not have dismissed its initial lawsuit against Mr. Kessman. Mr. Kessman's deceit also cost Ameranth one of its largest customers, Commerce Casino, and caused Ameranth

to pay Mr. Kessman a salary to which he was not entitled.

## COUNT VI: FRAUD
## (Against Mr. Kessman)

93.     Ameranth incorporates by reference paragraphs 1 through 92.

94.     On November 14, 2007, Mr. Kessman represented to Ameranth that he would not compete with Ameranth in the poker room management business while he remained Ameranth's Gaming Chief Technology Officer.

95.     Mr. Kessman knew that this representation was false: on November 8, 2007, Mr. Kessman secretly formed TeknoWidgets for the purpose of competing with Ameranth.

96.     Mr. Kessman intended to induce Ameranth's reliance on his misrepresentation. During the course of negotiating the Settlement Agreement, Ameranth made clear to Mr. Kessman a point that should have been obvious: Mr. Kessman's commitment not to compete with Ameranth while he was on the payroll, much less his commitment not to compete against Ameranth by misappropriating Ameranth's property, was a *sine qua non* of the Settlement Agreement and his continued employment with Ameranth

97.     Ameranth was justified in relying on the representations of Mr. Kessman, its Gaming Chief Technology Officer.

98.     Ameranth was damaged by Mr. Kessman's fraud. Had Ameranth known that Mr. Kessman was lying when he promised not to compete with Ameranth, Ameranth would have discharged him for cause in November 2007, and Ameranth would not have dismissed its initial lawsuit against Mr. Kessman. Mr. Kessman's deceit also cost Ameranth one of its largest customers, Commerce Casino, and caused Ameranth to pay Mr. Kessman a salary to which he was not entitled.

## COUNT VII: UNJUST ENRICHMENT
## (Against Both Defendants)

16

99.    Ameranth incorporates by reference paragraphs 1 through 98.

100.    Ameranth conferred a benefit on each Defendant by unwittingly providing him or it with Ameranth's property.

101.    Each Defendant actually appreciated the benefit of Ameranth's property, because each Defendant used Ameranth's property to sell TeknoWidgets' poker-room management products to Ameranth's current and potential customers.

102.    Retention of that benefit would be inequitable.

103.    Accordingly, Ameranth is entitled to restitution and the imposition of a constructive trust requiring any Defendant in possession of funds derived from selling TeknoWidgets' poker-room management products to Ameranth's current and potential customers, or any other product sold with the aid of Ameranth's property, to convey those monies, or title to property derived from those monies, to Ameranth.

## COUNT VIII: CALIFORNIA UNIFORM TRADE SECRETS ACT
### (Against Both Defendants)

104.    Ameranth incorporates by reference paragraphs 1 through 103.

105.    Ameranth took reasonable steps to maintain the secrecy of Ameranth's property, such as restricting access to Ameranth's physical premises, restricting access to its computer network, implementing confidentiality policies, and, not least, entering into the Settlement Agreement with Mr. Kessman.

106.    From July 22, 2006 through the present, Mr. Kessman and TeknoWidgets disclosed or used Ameranth's source code, technical manuals, emails, and customer lists.

107.    Mr. Kessman had a duty to Ameranth to maintain the secrecy of those items and limit their use.

108.    Mr. Kessman misused Ameranth's proprietary information maliciously.

17

109. Defendants' breaches of the California Uniform Trade Secrets Act have damaged Ameranth's relationships with current and potential customers, and entitle Ameranth to monetary damages and injunctive relief.

## COUNT IX: CONVERSION
### (Against Both Defendants)

110. Ameranth incorporates by reference paragraphs 1 through 109.

111. Each Defendant has intentionally exercised dominion and control over Ameranth's property so as to interfere with Ameranth's right to control that property and while Ameranth owned that property.

112. Accordingly, Ameranth has suffered, and will continue to suffer, monetary damages and irreparable harm.

## COUNT X: UNAUTHORIZED ACCESS TO COMPUTERS, COMPUTER SYSTEMS, AND COMPUTER DATA
### (Against Mr. Kessman)

113. Ameranth incorporates by reference paragraphs 1 through 112.

114. By virtue of California Penal Code § 502, Mr. Kessman had a duty to, *inter alia*, refrain from knowingly accessing and without permission altering, damaging, deleting, destroying, or otherwise using or causing to be used for improper purposes any data, computer, computer system or computer services developed, owned, or leased by Ameranth.

115. Mr. Kessman breached this duty by misappropriating from the Company's computers Ameranth's property.

116. Mr. Kessman took these actions to his benefit, and to Ameranth's detriment and injury.

117. As a direct and proximate result of these actions, Ameranth has suffered damages to its business and business relationships, including, without limitation, those damages available

to Ameranth pursuant to Penal Code section 502(e)(1).

118.    Mr. Kessman committed the acts alleged herein maliciously, fraudulently, and

with the wrongful and deliberate intention of injuring Ameranth and benefiting himself and, in so

doing, acted with an improper motive amounting to malice and conscious disregard of

Ameranth's rights.  Accordingly, Ameranth is entitled to recover punitive or exemplary damages

in an amount to be ascertained at the time of trial as provided in Penal Code § 502(e)(4).

## COUNT XI: RECEIPT OF STOLEN PROPERTY
## (Against Both Defendants)

119.    Ameranth incorporates by reference paragraphs 1 through 118.

120.    Mr. Kessman stole Ameranth's property.

121.    Mr. Kessman and TeknoWidgets know, and have long known, that the property

was stolen.

122.    Mr. Kessman and TeknoWidgets have possession of the stolen property.

123.    Ameranth has been injured by Defendants' possession of its stolen property.

124.    Pursuant to California Penal Code § 496(c), Ameranth is therefore entitled to

three times the amount of its actual damages, costs of suit, and attorney's fees

## COUNT XII: PIERCING THE CORPORATE VEIL
## (Against TeknoWidgets)

125.    Ameranth incorporates by reference paragraphs 1 through 124.

126.    TeknoWidgets is the mere instrumentality of its owner, Mr. Kessman.

127.    Mr. Kessman exercised control over TeknoWidgets in such a way as to harm or

defraud Ameranth.

128.    There is such a unity of ownership between Mr. Kessman and TeknoWidgets that

their separateness has ceased.

129.    Respecting TeknoWidgets' separate corporate existence would sanction a fraud or

injustice, or subject Ameranth to an unjust loss.

130.    Accordingly, the Court should pierce the corporate veil of TeknoWidgets.

**WHEREFORE,** Ameranth prays for the following relief:

1.    That Ameranth be awarded temporary, preliminary, and permanent injunctive relief against Defendants and all of their agents to halt continuation of such wrongful conduct;

2.    That Defendants be ordered to return all of Ameranth's property;

3.    That each Defendant be ordered to cease using the QueueOS name;

4.    That each Defendant be enjoined from soliciting customers for poker room management products and services for a period of time sufficient to protect Ameranth's interests and remedy Defendants' wrongdoing;

5.    That Ameranth be awarded compensatory damages to be determined at trial in the amount of losses resulting from Defendants' activities;

6.    That Ameranth be awarded treble damages;

7.    That Ameranth be awarded punitive and exemplary damages in an amount to be determined by the Court as a result of Defendants' willful and malicious conduct;

8.    That Ameranth be awarded attorneys' fees and costs incurred in the prosecution of this action;

9.    That Ameranth be awarded prejudgment interest in the maximum amount allowable by law; and

        10.     That Ameranth be awarded such other relief as the nature of its claims may

require.

David G. Culley, Esquire (DE #2141)
Susan List Hauske, Esquire
Tybout, Redfearn & Pell
750 Shipyard Drive, Suite 400
Wilmington, DE 19899
(302) 658-6901
dculley@trplaw.com

Of Counsel:

William J. Leahy, (PA #80340)
Matthew J. Hank, (PA #86086)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102.1321
(267) 402-3000

Attorneys for Plaintiff
AMERANTH, INC.

Dated: November 17, 2008

## **VERIFICATION**

I, Vern Yates, hereby certify as follows:

1.     I am the President and Chief Executive Officer of in Ameranth, Inc.("Ameranth") As such, I am authorized to make this Verification on Ameranth's behalf.

2.     I have read the attached Verified Complaint and, based on my personal knowledge and my knowledge of information reported to me by subordinates and colleagues who report to me, the factual allegations contained in the Verified Complaint are true.

3.     I certify under penalty of perjury under the laws of the United States of America that the foregoing statements made by me are true and correct.

VERN YATES

Executed on _11/14/08_